**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

v.

JEFFREY R. MACDONALD,

  *Defendant-Appellant.*

---

NEW ENGLAND INNOCENCE PROJECT;
THE INNOCENCE PROJECT; NORTH
CAROLINA CENTER ON ACTUAL
INNOCENCE; NATIONAL
ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS,

  *Amici Supporting Appellant.*

No. 08-8525

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(3:75-cr-00026-F-1; 5:06-cv-00024-F)

Argued: March 23, 2010

Decided: April 19, 2011

Before MICHAEL,[1] MOTZ, and KING, Circuit Judges.

---

[1]Judge Michael heard oral argument in this case but passed away before the decision was filed. The decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Motz joined.

---

## COUNSEL

**ARGUED:** Joseph Edward Zeszotarski, Jr., POYNER SPRUILL LLP, Raleigh, North Carolina, for Appellant. John F. De Pue, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** George E. B. Holding, United States Attorney, John Stuart Bruce, First Assistant United States Attorney, Brian M. Murtagh, Special Assistant United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. Barry C. Scheck, THE INNOCENCE PROJECT, New York, New York; Andrew Good, Philip G. Cormier, Harvey A. Silverglate, New England Innocence Project, GOODWIN PROCTER LLP, Boston, Massachusetts; Christine Mumma, NORTH CAROLINA CENTER ON ACTUAL INNOCENCE, Durham, North Carolina, for Amici Supporting Appellant.

---

## OPINION

KING, Circuit Judge:

In 1979, Jeffrey R. MacDonald was convicted in the Eastern District of North Carolina of the 1970 murders of his pregnant wife and their two young daughters in the family's Fort Bragg home. MacDonald — who has steadfastly maintained that he is innocent of those horrific crimes — ultimately failed to have his convictions overturned on direct appeal and has since filed numerous motions for postconviction relief.

As part of his most recent effort, MacDonald secured pre-filing authorization from this Court in January 2006 for a successive 28 U.S.C. § 2255 motion (the "§ 2255 motion"), which asserted a Fifth Amendment due process claim based on the newly discovered evidence of former Deputy U.S. Marshal Jim Britt (the "Britt claim"). Shortly after MacDonald presented the § 2255 motion to the district court, the results of DNA testing previously authorized by this Court in 1997 became available. Consequently, in March 2006, Mac-Donald moved in the district court — without seeking or obtaining further prefiling authorization — to add a second claim to the § 2255 motion premised on the DNA test results. More specifically, MacDonald sought in his March 2006 motion (the "DNA motion") to raise a freestanding actual innocence claim (the "DNA claim"). Additionally, the DNA motion urged the district court to consider the DNA test results as part of the "evidence as a whole" in assessing the Britt claim under § 2255. *See* § 2255(h)(1) (providing that successive § 2255 motion must contain "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense"). MacDonald also proffered additional evidence — some excluded at trial, some submitted in prior unsuccessful postconviction proceedings, and some more recently obtained — for the district court to consider in its analysis of both the Britt claim and the DNA claim.

By its decision of November 4, 2008, the district court denied the DNA motion, on the ground that the court lacked jurisdiction as a result of MacDonald's failure to secure additional prefiling authorization from this Court. *See United States v. MacDonald*, No. 75-CR-26 (E.D.N.C. Nov. 4, 2008) (the "Opinion").[2] The district court also refused to consider

---

[2]The unpublished Opinion is found at J.A. 1517-63. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

the DNA test results and other evidence proffered by Mac-
Donald as part of the "evidence as a whole" relevant to the
Britt claim. And finally, after performing its more searching
assessment of the Britt claim than we had conducted for pur-
poses of prefiling authorization, the district court denied Mac-
Donald leave to file the § 2255 motion.

As explained below, the district court erred in assessing the
Britt claim by taking an overly restrictive view of what consti-
tutes the "evidence as a whole," and further erred in renounc-
ing jurisdiction over the DNA claim. Accordingly, without
expressing any view on the proper ultimate disposition of
either claim, we vacate the Opinion and remand for further
consideration of both the Britt claim and the DNA claim.

I.

A.

Much has been written about Jeffrey MacDonald's case, by
both the courts and the media. As background, we include the
following recitation of the facts spelled out by the district
court, in 1985, in its first postconviction decision.

> In the early morning of February 17, 1970, MacDon-
> ald's pregnant wife, Colette, and his two daughters,
> Kristen and Kimberly, two and five years old, were
> clubbed and stabbed to death in their apartment at
> Fort Bragg, North Carolina. When military police
> arrived at the crime scene following a telephone call
> from MacDonald, they found MacDonald, a physi-
> cian and Captain in the Army Medical Corps, uncon-
> scious and lying partially across his wife's body in
> the master bedroom. The bodies of Kristen and Kim-
> berly MacDonald were found in their bedrooms.
> Although MacDonald had sustained a number of
> stab wounds, one of which partially collapsed a lung,
> he was treated at the Womack Army Hospital Emer-

gency Room and released after a brief hospitalization.

On the morning and afternoon of the murders and in subsequent interviews, MacDonald told investigators that the murders had been committed by four drug-crazed intruders. He said that upon retiring at approximately 2:00 a.m. to 2:30 a.m., he found that his youngest daughter, Kristen, had crawled into bed with his wife and had wet his side of the bed. He picked her up and returned her to her own room and then went into the living room to lay down on the sofa where he fell asleep. Sometime later, he was awakened by his wife and oldest daughter's screams and looked up to see a woman with blonde hair wearing a floppy hat, boots and a short skirt carrying a lighted candle and chanting "acid is groovy; kill the pigs." He said that three men, two white and one black, standing near the couch then attacked him, pulling or tearing his pajama top over his head which he then used to ward off their blows. The three attackers continued to club and stab him until he lost consciousness. When he awoke on the hall steps to the living room, MacDonald stated that he got up and went to the master bedroom where he found his wife dead. He said that he pulled a Geneva Forge knife out of her body and covered her with his pajama top and a bathmat. He then went to his children's rooms and unsuccessfully tried to revive them. After going to the bathroom to wash himself and calling the military police, he again lost consciousness.

The military police, the Army's Criminal Investigation Division (CID), the FBI and the Fayetteville, North Carolina Police Department initially accepted MacDonald's account of the murders and immediately began searching for four people fitting his

descriptions. At the same time, they continued to examine the crime scene and began to discover evidence which cast doubt on MacDonald's story. Although MacDonald had said that his pajama top was torn during his struggle with the three assailants in the living room, no fibers from the pajama top were found in that room. Fibers were found, however, inside and outside the body outline of Colette MacDonald in the master bedroom and in the rooms of Kristen and Kimberly MacDonald. A piece of a plastic surgeon's glove, stained with Colette Mac-Donald's blood, was found inside a sheet in a pile of bedding at the foot of the master bed. Moreover, although there were numerous unidentified fingerprints in the apartment, no direct evidence of the alleged intruders was found to support MacDonald's version as to what happened on the night of the murders. From this and similar evidence, investigators became convinced that MacDonald had killed his family and staged the crime scene to cover up the murders.

The Army eventually charged MacDonald with the murders and a formal pre-court martial investigation was conducted and hearings held pursuant to Article 32 of the Uniform Code of Military Justice. At the close of the Article 32 proceedings, the investigating officer recommended that all charges against MacDonald be dismissed and that civilian authorities investigate Helena Stoeckley, a young woman resembling MacDonald's description of the female assailant, as a possible suspect.

MacDonald was subsequently discharged from the Army but investigation of the case continued into the early 1970's. Over six hundred witnesses were interviewed and a thirteen-volume report, twice supplemented, was prepared by the CID. Based upon this

report and other evidence gathered by civilian and military authorities and testimony by witnesses, one of which was MacDonald, on January 24, 1975 the grand jury indicted MacDonald for the murder of his family. A series of pre-trial motions and interlocutory appeals delayed trial of the case until July of 1979.

During the seven-week trial of the case, the government presented extensive physical and circumstantial evidence supported by expert and lay testimony. Physical evidence ranging from the amounts of MacDonald's pajama top fibers found in various rooms in the MacDonald residence to the pattern of blood spatterings on the victims and in the rooms of the apartment was offered.[3] The government also pointed to the absence of evidence in the apartment linking Helena Stoeckley or anyone else to the crimes, apparent contradictions in MacDonald's numerous accounts of what transpired that morning, and the marital difficulties MacDonald and his wife were allegedly having prior to February 17, 1970.

MacDonald's defense consisted primarily of his own testimony, character witnesses, and impeachment of the integrity of the crime scene and evidence offered by the prosecution. Although Helena Stoeckley was located during the trial and offered as an exculpatory witness, she testified before the jury that she was not involved in the murders but that because

---

[3]In its 1985 decision, the district court noted that "MacDonald, his wife and two daughters all had different blood types: Colette MacDonald — Type A, Jeffrey MacDonald — Type B, Kimberly MacDonald — Type AB and Kristen MacDonald — Type O. This allowed investigators to reconstruct the sequence of events occurring in the MacDonald apartment on the night of the murders." *United States v. MacDonald*, 640 F. Supp. 286, 290 n.2 (E.D.N.C. 1985).

of her drug crazed condition and bizarre behavior following the murders, she at least had come to wonder whether she was in fact involved. The jury apparently believed that she was not, for after six hours of deliberation MacDonald was found guilty of two counts of second-degree murder and one count of first-degree murder.

*United States v. MacDonald*, 640 F. Supp. 286, 289-90 (E.D.N.C. 1985). Following his convictions by the jury in 1979, the trial court sentenced MacDonald to three consecutive life terms of imprisonment, which he is currently serving. *See id.* at 288.

B.

On direct appeal, a divided panel of this Court reversed MacDonald's convictions on the ground that his Sixth Amendment guarantee of a speedy trial had been contravened by the government's delay in obtaining the indictment. *See United States v. MacDonald*, 632 F.2d 258, 260 (4th Cir. 1980). The Supreme Court, however, rejected the premise for the speedy trial ruling — "that criminal charges were pending against MacDonald during the entire period between his military arrest and his later indictment on civilian charges" — and thus reversed our judgment and remanded for further proceedings. *See United States v. MacDonald*, 456 U.S. 1, 9-11 (1982). On remand, we assessed MacDonald's remaining appellate contentions but found no error and affirmed his convictions. *See United States v. MacDonald*, 688 F.2d 224, 234 (4th Cir. 1982). One of those contentions was that the trial court had erroneously excluded the testimony of seven so-called "Stoeckley witnesses" concerning alleged inculpatory statements made by Helena Stoeckley in the aftermath of the murders. *See id.* at 230-34. On that issue, our Judge Murnaghan reluctantly agreed with the other panel members that the trial court had not abused its discretion; in a concurring opinion, he observed that "the case provokes a strong uneasiness

in me" and explained his belief that "MacDonald would have had a fairer trial if the Stoeckley related testimony had been admitted." *Id.* at 236 (Murnaghan, J., concurring).

## C.

In 1984, MacDonald filed his first motion for postconviction relief, seeking a writ of habeas corpus under 28 U.S.C. § 2255 and a new trial pursuant to Federal Rule of Criminal Procedure 33. Notably, MacDonald's Rule 33 new trial request relied on additional confessions made by Helena Stoeckley (who had died in 1983), as well as inculpatory statements made by Stoeckley's former boyfriend Greg Mitchell (who Stoeckley had implicated in the murders and who himself had died in 1982). The district court denied relief in its 1985 decision, *see MacDonald*, 640 F. Supp. at 333-34, and we affirmed, *see United States v. MacDonald*, 779 F.2d 962, 963 (4th Cir. 1985).

Thereafter, in 1990, MacDonald filed his second motion for postconviction relief, asserting claims under § 2255 that the government had unconstitutionally withheld and suppressed exculpatory evidence from the defense consistent with his account of murderous intruders. This evidence included blond synthetic hair-like fibers found on a hairbrush in the MacDonald home — evidence that could incriminate Stoeckley, who had been known to wear a blond wig that she had admitted destroying within a few days after the murders. The allegedly suppressed evidence also included unmatched human hairs and woolen and cotton fibers collected from the victims' bedding, from places on and near Colette MacDonald's body, and from the wooden club used as a murder weapon. On the merits of MacDonald's claims, the district court observed that "the ultimate question [was] whether the jury's verdict would have been different had the defense been aware of the allegedly suppressed evidence at the time of trial." *United States v. MacDonald*, 778 F. Supp. 1342, 1349 (E.D.N.C. 1991). Relying on the report of an FBI forensic examiner that "the

blond synthetic fibers . . . were not consistent with blond wig hairs from any known wig fibers currently in the FBI laboratory reference collection," *id.* at 1350, and observing that the other unmatched hair and fibers "could have fallen in the house at any time prior to the murders," *id.* at 1351, the court concluded that "the allegedly suppressed evidence would [have] simply mirror[ed] other evidence of unexplained household debris that was presented to the jury," *id.* Additionally, the court ruled that the allegedly suppressed evidence would not have caused it to admit trial testimony by the seven "Stoeckley witnesses," and that, in any event, the government had not engaged in improper efforts to suppress the evidence. *See id.* at 1352-56.

Finally and alternatively, the district court determined that the claims in MacDonald's second postconviction motion were barred under the then-applicable doctrine of abuse of the writ, which generally prohibited subsequent habeas consideration of claims not raised, and thus defaulted, in a first federal habeas proceeding. *See MacDonald*, 778 F. Supp. at 1356 (citing *McCleskey v. Zant*, 499 U.S. 467, 493-95 (1991) (recognizing that such procedural default will be excused only upon showing of "cause and prejudice" or factual innocence implicating "fundamental miscarriage of justice")). The court explained that information about the allegedly suppressed evidence was in MacDonald's possession in 1984 when his first postconviction motion was filed, and that he failed to satisfy either of *McCleskey*'s standards for excuse of his procedural default. *See id.* at 1356-60. On appeal, we affirmed the denial of § 2255 relief, reaching only the procedural default issue. *See United States v. MacDonald*, 966 F.2d 854, 856 (4th Cir. 1992) ("We find that MacDonald does not meet the stringent requirements of *McCleskey* . . . necessary to overcome dismissal of a second or subsequent collateral claim for abuse of the writ.").

In 1997, MacDonald filed a motion to reopen the proceedings on his second postconviction motion, pursuant to Federal

Rule of Civil Procedure 60(b), on the ground that the government and one of its witnesses (the FBI forensic examiner responsible for analyzing the blond synthetic fibers) had perpetrated a fraud on the court. In support of his motion, MacDonald claimed that he had discovered evidence establishing that the FBI forensic examiner had falsely testified that the blond fibers — because they were made from a substance called "saran" — likely had come from a doll rather than a wig. MacDonald's evidence reflected that, contrary to the FBI forensic examiner's testimony, the FBI's own reference collection contained a text stating that saran was used in the manufacture of wigs, and that, prior to filing its response to the second motion, the government had interviewed two doll experts who opined that the blond fibers probably did not come from a doll. MacDonald also proffered affirmative evidence — consisting of recently obtained statements of wig and fiber industry executives — that saran was used to make wigs before 1970. In conjunction with his Rule 60(b) motion to reopen proceedings, MacDonald sought access to all items of physical evidence analyzed by the FBI forensic examiner, plus other unsourced hairs, fibers, and blood debris found in critical locations, so that he could conduct independent laboratory analyses including newly available DNA tests.

The district court denied MacDonald's Rule 60(b) motion for failure to show that the FBI forensic examiner's testimony was material to the disposition of the second postconviction motion or that the FBI forensic examiner or any other government agent had committed wrongdoing in defending against the second motion. *See United States v. MacDonald*, 979 F. Supp. 1057, 1069 (E.D.N.C. 1997). The court further recognized, however, that to the extent the Rule 60(b) motion relied on new evidence — the statements of wig and fiber industry executives — to demonstrate MacDonald's actual innocence, the motion was akin to a successive § 2255 motion for habeas relief. *See id.* at 1067-68. Citing recent amendments to § 2255 engendered by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the court concluded that it was

obliged to "transfer this matter to the Court of Appeals for the Fourth Circuit for consideration" of whether to grant prefiling authorization for the successive § 2255 motion. *Id.* at 1068. Finally, in light of its other rulings, the court concluded that "there [was] no basis on which to allow MacDonald discovery," and thus denied his request for access to items of physical evidence to conduct DNA tests and other independent analyses. *Id.* at 1067.

We thereafter considered and disposed of two separate appeals from the district court's 1997 decision. In the first appeal, by Order of October 17, 1997, we denied MacDonald authorization to file a successive § 2255 motion. *See In re MacDonald*, No. 97-713 (4th Cir. Oct. 17, 1997). By that same Order, however, we ruled "that the motion with respect to DNA testing is granted and this issue is remanded to the district court." *Id.* We subsequently issued an unpublished per curiam decision in the second appeal, affirming the district court's denial of MacDonald's Rule 60(b) motion to reopen proceedings premised on the government's alleged fraud on the court. *See United States v. MacDonald*, No. 97-7297 (4th Cir. Sept. 8, 1998). Thereafter, until the present proceedings, the district court's involvement in MacDonald's case was limited to resolving issues about the performance of the DNA testing.

## II.

### A.

MacDonald initiated the present proceedings by seeking from this Court, as mandated by AEDPA, prefiling authorization for the § 2255 motion asserting the Britt claim. We granted such authorization on January 12, 2006, based on our determination that the § 2255 motion made "a prima facie showing" of the requirements for a successive motion. *See* 28 U.S.C. § 2244(b)(3)(C); *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003) ("The court of appeals must examine

the application to determine whether it contains any claim that satisfies § 2244(b)(2) (for state prisoners) or § 2255[(h)] (for federal prisoners)."); *see also In re Williams*, 364 F.3d 235, 238 (4th Cir. 2004) ("The initial determination of whether a claim satisfies these requirements must be made by a court of appeals.").[4] In granting prefiling authorization for the § 2255 motion, we left it to the district court to conduct a more searching assessment of whether that motion satisfied the successive motion standard. *See Winestock*, 340 F.3d at 205 ("When the application is thereafter submitted to the district court, that court must examine each claim and dismiss those that are barred under § 2244(b) or § 2255[(h)].").

On January 17, 2006, after obtaining our authorization, MacDonald presented the § 2255 motion to the district court. According to MacDonald's memorandum in support of the § 2255 motion, the Britt claim was premised on the following newly discovered evidence:

> In January of 2005, counsel for Jeffrey MacDonald, Wade Smith, Esq., was first contacted by a former deputy United States Marshal, Jim Britt, with information, previously concealed, about prosecutorial misconduct during the MacDonald trial. Britt, now retired, served with distinction for twenty-two years as a deputy United States Marshal entrusted with the security of the federal courts and judges in North

---

[4]At the time of our 2003 *Winestock* decision, the provision applicable to federal prisoners — § 2255(h) — was designated as § 2255 ¶ 8 but contained the same language. Under this provision, "[a] second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain" either "(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense," § 2255(h)(1), or "(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," § 2255(h)(2).

Carolina. Britt was working at the Raleigh court-house during the 1979 MacDonald trial and was responsible for escorting the key defense witness, Helena Stoeckley, who was in custody on a material witness warrant. Jim Britt was present in the prosecutor's office when the lead prosecutor, James Blackburn, interviewed Helena Stoeckley, the day before she was to be called as a witness. As reflected in his sworn affidavit . . . , Jim Britt avers that he personally witnessed Helena Stoeckley state to James Blackburn that she and others were present in the MacDonald home on the night of the MacDonald murders and that they had gone there to acquire drugs; Jim Britt further avers that he witnessed and heard James Blackburn, upon hearing this, directly threaten Helena Stoeckley, telling her that if she so testified in court he would indict her for first degree murder. This threat caused her to change her testimony, as the next day, when called to the witness stand by the defense, Stoeckley claimed to have amnesia as to her whereabouts from midnight until 5 a.m. the night of the MacDonald murders — the precise time-frame during which the crimes occurred. James Blackburn never disclosed to the court or defense counsel what Helena Stoeckley admitted to him in Jim Britt's presence. On the contrary, Blackburn, at a critical juncture in the trial, advised the court that Stoeckley, when he interviewed her, denied having any knowledge of the MacDonald family, the MacDonald home, or involvement in the MacDonald murders. Blackburn even went so far as to elicit from Stoeckley, through leading questions before the jury, testimony that was contrary to what she had told him during his interview of her the day before in the presence of Jim Britt.

J.A. 935-36. MacDonald's memorandum noted that the DNA testing authorized in 1997 had "been ongoing since then," and

explained that MacDonald was nonetheless proceeding with the Britt claim because of AEDPA's one-year limitations period for asserting claims based on newly discovered evidence. *Id.* at 934 n.1; *see* § 2255(f)(4). The memorandum requested that the district court "consider this new evidence [underlying the Britt claim], notwithstanding whatever results are produced by the DNA testing." J.A. 934 n.1. In addition to the Britt affidavit, the memorandum incorporated numerous exhibits, including the affidavits of three other witnesses swearing that Helena Stoeckley's boyfriend, Greg Mitchell, had confessed to murdering the MacDonald family.

In March 2006, shortly after the § 2255 motion was submitted to the district court, the results of the DNA testing — conducted by the Department of Defense Armed Forces Institute of Pathology ("AFIP") — finally became available. On March 22, 2006, MacDonald filed the DNA motion in the district court, without first requesting prefiling authorization from this Court. As described above, the purpose of the DNA motion was twofold: first, MacDonald sought to raise the DNA claim, a freestanding actual innocence claim, as an additional predicate to the pending § 2255 motion; and second, he sought to have the district court consider the DNA test results as part of the "evidence as a whole" in assessing the Britt claim under § 2255(h)(1). According to the DNA motion,

> 28 biological specimens were deemed by the AFIP laboratory sufficient for testing for DNA results to be matched against known exemplars from the MacDonald family members, as well as Helena Stoeckley and Greg Mitchell. Of these 28 specimens tested, 9 specimens either produced no useable result or produced an inconclusive result. Of the remaining 19 specimens, 13 specimens were consistent with members of the MacDonald family who were killed. Of the 6 specimens remaining, three were consistent with the DNA of Jeffrey MacDonald. The three remaining specimens, specimens 58A1, 75A, and

91A, provided DNA results that did not match any of the MacDonald family members or Helena Stoeckley or Greg Mitchell.

. . . Regarding the unidentified specimens, specimen 58A1 was a hair found at the crime scene on the bedspread in Kristen MacDonald's room. Specimen 75A was a 63 mm. (2 1/4 inch) hair with root and follicle intact retrieved at the crime scene from off or under the body of Colette MacDonald. And also, most tellingly, specimen 91A was hair with the root intact, found along with blood residue underneath the fingernail of three-year-old Kristen MacDonald, who at the crime scene was found murdered in her bed. . . .

. . . [T]hese unidentified hairs, and particularly the ones found in such critical places as underneath the fingernail (along with blood fragments) of a child who was murdered in her bed, and who clearly suffered other defensive wounds and was trying to defend herself at the time she was murdered, and a hair of over two inches in length with hair and follicle intact found under Colette MacDonald's body is profound new evidence that could not have previously been discovered through due diligence, and that when viewed in light of the other evidence taken as a whole, entitles the petitioner to have his sentence vacated. Further, . . . this new evidence, irrespective of the new evidence submitted through witness Jim Britt, entitles the petitioner to have the entire panoply of evidence reviewed (both evidence adduced at trial, and developed post-trial), and to have a determination now made of whether this evidence, analyzed in its entirety, proves the petitioner's innocence.

J.A. 1090-91 (footnotes omitted).

On March 23, 2006, the day after he filed the DNA motion, MacDonald moved, pursuant to Rule 7 of the Rules Governing Section 2255 Proceedings for the United States District Courts, to expand the record to include an attached statement of itemized material evidence. MacDonald contended that his itemized evidence — including evidence excluded at trial (e.g., the testimony of the "Stoeckley witnesses"), evidence submitted with prior unsuccessful postconviction motions (e.g., the blond synthetic hair-like fibers), and evidence more recently discovered (e.g., the DNA test results and the three affidavits describing confessions made by Mitchell) — was part of the "evidence as a whole" relevant to the district court's consideration of the Britt claim and the separate DNA claim. On March 30, 2006, the government filed a motion to strike certain exhibits submitted with the § 2255 motion — specifically, the three affidavits detailing Mitchell's confessions. Thereafter, on May 6, 2007, MacDonald filed a motion to supplement his proposed statement of itemized material evidence with an affidavit allegedly executed by Helena Stoeckley's since-deceased mother, who was also named Helena Stoeckley, swearing that the daughter had twice confided in her mother that she was present in the MacDonald home during the February 17, 1970 murders.

B.

By its Opinion of November 4, 2008, the district court granted the government's motion to strike exhibits from the § 2255 motion; denied the DNA motion, as well as MacDonald's motions to expand the record with the attached statement of itemized evidence and to supplement such statement; and denied MacDonald leave to file the § 2255 motion. The court observed that the government had moved to strike exhibits from the § 2255 motion — the three affidavits describing confessions made by Greg Mitchell — "for one or both of two reasons: first, because MacDonald's claims relating to Mitchell's 'confessions' previously were considered and rejected in this court's earlier post-conviction motions;

and, second, because this evidence is untimely." Opinion 18. The court granted the government's motion to strike "for the reasons cogently set forth" therein. *Id.*

Turning to the DNA motion, as well as MacDonald's motion to supplement his proposed statement of itemized material evidence with the affidavit of the elder Helena Stoeckley, the district court characterized those motions as "seek[ing] to add discrete factual bases to" the § 2255 motion raising the Britt claim. *See* Opinion 18. The court concluded that, because "[t]he only grounds upon which MacDonald sought or obtained [prefiling authorization] are contained in his [§ 2255 motion] concerning the Britt affidavit," "the DNA and the elder Stoeckley affidavit motions are bootstrapping, piggybacking attempts." *Id.* at 20 (internal quotation marks omitted). As such, the court ruled that the claims in the DNA and the elder Stoeckley affidavit motions were "untimely, successive and independent," thus depriving the court of "subject matter jurisdiction over them." *Id.*

With respect to MacDonald's motion to expand the record with the attached statement of itemized material evidence, the district court "reject[ed] his suggestion that [the court was] required, under the circumstances presented by this case, to expand the record and to consider every manner of supplementary material he deems supportive of his position, regardless of its source or its competence." Opinion 21. Furthermore, the court found that the pre-existing record was "more than adequate to permit a thorough and complete understanding of the material facts pertinent to the motions now before it." *Id.* at 21-22.

With only the § 2255 motion remaining for its consideration, the district court observed that MacDonald had "pass-[ed] through [the] first gate" by obtaining prefiling authorization from this Court. Opinion 24. The district court then explained that its role was to "conduct[ ] the second gatekeeping step by examining each claim of the proposed

successive application without reaching the merits, and dismissing those that fail to satisfy the requirements for the filing of such a motion." *Id.* at 25 (internal quotation marks omitted). Notably, the court deemed the applicable standard to be that found in 28 U.S.C. § 2244(b)(2)(B), rather than § 2255(h)(1). *See id.* at 24. Pursuant to § 2244(b)(2)(B), the movant must demonstrate (1) that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," § 2244(b)(2)(B)(i), and (2) that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense," § 2244(b)(2)(B)(ii). In assessing the Britt claim under that standard, the court "afford[ed] MacDonald the benefit of the assumption that he exercised due diligence in discovering Britt's assertions." Opinion 28. Nevertheless, the court concluded that "MacDonald has not demonstrated that the Britt affidavit, taken as true and accurate on its face and viewed in light of the evidence as a whole" — i.e., the evidence in the pre-existing record — "could establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found MacDonald guilty of the murder of his wife and daughters." *Id.* at 46.[5]

---

[5]On November 24, 2008, the government filed a motion to publish and modify the Opinion. By Order of January 9, 2009, the district court largely denied the government's motion, except to allow a few minor revisions on "clerical, non-substantive matters." *United States v. MacDonald*, No. 75-CR-26, slip op. at 2 (E.D.N.C. Jan. 9, 2009). The court recognized that the government's most significant modification request was based on its revelation "that it has evidence, including affidavits and official documents, that prove the falsity of Jim Britt's affidavit." *Id.* at 1-2. According to the court, "[t]he Government apparently withheld this evidence under the assumption that the [§ 2255 motion] would survive the thorough review required for the . . . court's gatekeeping function, and that an evidentiary hearing would be ordered at which the Government at last would drop its bombshell. It did not work out that way." *Id.* at 2 (internal quotation marks

## C.

After the district court denied him a certificate of appealability ("COA"), MacDonald sought a COA from this Court so that he could appeal the Opinion. *See* 28 U.S.C. § 2253(c)(1)-(2) (requiring a § 2255 applicant to obtain a COA, by making "a substantial showing of the denial of a constitutional right," in order to appeal an adverse final order of the district court); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (recognizing that, if the district court refused relief on procedural grounds, a COA should issue upon the applicant's showing "that jurists of reason would find it debatable whether" (1) "the petition states a valid claim of the denial of a constitutional right" and (2) "the district court was correct in its procedural ruling"). In his informal brief of February 20, 2009, MacDonald requested certification of three issues: (1) that the district court erred in denying him leave to file the § 2255 motion because, in assessing the Britt claim asserted therein, the court failed to consider the "evidence as a whole," including the DNA test results, the evidence in his statement of itemized material evidence and the proposed supplement thereto, and the three affidavits stricken at the government's request; (2) that the court erred in denying the DNA motion on the ground that he was required to obtain additional prefiling authorization before either relying on the DNA test results in connection with the Britt claim or asserting the freestanding DNA claim; and (3) that the court erred in its assessment of the Britt claim both by excluding, and thus ignoring, relevant evidence and by drawing flawed conclusions from the

omitted). The court refused to modify the Opinion to address the government's evidence on the grounds that the government provided no legal basis for such modification, and that the request "reveal[ed] a failure to recognize that the truth or falsity of Britt's affidavit . . . is irrelevant to this court's rationale for denying MacDonald's request to file [the] § 2255 motion." *Id.* (The unpublished Order of January 9, 2009, is found at J.A. 1672-74.)

evidence it did consider. On June 9, 2009, we granted Mac-
Donald a COA on the following issue:

> [W]hether the district court's procedural decisions
> prohibiting expansion of the record to include evi-
> dence received after trial and after the filing of the
> [§ 2255] motion was erroneous in light of 28 U.S.C.
> § 2244(b)(2)(B)(ii) (2006).

*See United States v. MacDonald*, No. 08-8525 (4th Cir. June
9, 2009). The parties subsequently filed formal briefs and oral
argument was scheduled for March 23, 2010.

Ten days before argument, on March 13, 2010, the govern-
ment filed a motion to dismiss this appeal on the ground that
the COA was insufficient to establish 28 U.S.C. § 2253 juris-
diction; as we understood the government's position, it was
that we had failed to certify an issue of constitutional magni-
tude and, thus, could not exercise jurisdiction over the appeal.
We heard argument on the previously scheduled date and
then, by Order of May 6, 2010, denied the government's
motion to dismiss. *See United States v. MacDonald*, No. 08-
8525 (4th Cir. May 6, 2010). By that same Order, we explic-
itly recognized that MacDonald had made a substantial show-
ing of the denial of a constitutional right with respect to both
the Britt claim and the DNA claim, and we amended the COA
to encompass the following issues:

> (1)  Whether the district court erred in assessing the
>       Britt claim by applying the standard of 28
>       U.S.C.  § 2244(b)(2)(B)(ii),  rather  than
>       § 2255(h)(1); by prohibiting expansion of the
>       record to include evidence received after trial
>       and after the filing of the 28 U.S.C. § 2255
>       motion; and by excluding, and thus ignoring,
>       relevant evidence and drawing flawed conclu-
>       sions from the evidence it did consider; and

    (2)    Whether the district court's procedural decision with respect to the freestanding DNA claim, requiring additional prefiling authorization from this Court, was erroneous in light of 28 U.S.C. § 2255(h).

*Id.* at 7. Additionally, we directed the parties to file supplemental briefs on the issues identified in the amended COA that were not addressed in their formal briefs. The last of those supplemental briefs having been submitted, this appeal — over which we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253 — is ripe for decision.[6]

### III.

In an appeal from the denial of authorization to file a successive 28 U.S.C. § 2255 motion — just as we do in an appeal from the denial of a first or successive § 2255 motion once filed — we review a district court's conclusions of law de novo. *See United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007) ("When reviewing an appeal from the denial of a § 2255 motion, we review de novo the district court's legal conclusions."); *Reyes-Requena v. United States*, 243 F.3d 893, 900 (5th Cir. 2001) ("A district court's denial of a second § 2255 motion on the ground that the motion fails to meet AEDPA's conditions is a legal conclusion, which we review under a de novo standard of review."). Similarly, our review is de novo where a district court construes a motion as a successive § 2255 motion and dismisses it for failure to obtain prefiling authorization from a court of appeals. *See Lang v. United States*, 474 F.3d 348, 351 (6th Cir. 2007) ("Whether or not [a] motion is 'second or successive' within the meaning of § 2255 is . . . an issue that we review de novo.").

---

[6]Notably, in our Order of May 6, 2010, we instructed the parties to state in their supplemental briefs any request for further oral argument. Although the parties requested it, we are satisfied that further argument would not be of assistance and thus deny those requests.

IV.

A.

In resolving the first issue before us under MacDonald's COA — whether the district court erred in assessing the Britt claim — we begin with the threshold question of whether the court erred by applying the standard of 28 U.S.C. § 2244(b)(2)(B)(ii), rather than § 2255(h)(1). We then turn to whether the court erred by prohibiting expansion of the record to include evidence received after trial and after the filing of MacDonald's § 2255 motion. Finally, we focus on whether the court erred by excluding, and thus ignoring, relevant evidence or by drawing flawed conclusions from the evidence it did consider.

1.

On the threshold question with respect to the Britt claim, we conclude that the district court erred by applying the standard of 28 U.S.C. § 2244(b)(2)(B)(ii), rather than § 2255(h)(1). As we explained in *United States v. Winestock*, § 2244(b)(2) sets forth the controlling standard for state prisoners, and § 2255(h) spells out the standard applicable to those in federal custody. *See* 340 F.3d 200, 205 (4th Cir. 2003) (observing that the prefiling authorization inquiry involves a determination of whether the application "contains any claim that satisfies § 2244(b)(2) (for state prisoners) or § 2255[(h)] (for federal prisoners)"). Nonetheless, the standards of § 2244(b)(2)(B)(ii) and § 2255(h)(1) are quite similar. *Compare* § 2244(b)(2)(B)(ii) (demanding that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense"), *with* § 2255(h)(1) (requiring "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear

and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense").

Because of the similarities between § 2244(b)(2)(B)(ii) and § 2255(h)(1), *see, e.g.*, *In re Dean*, 341 F.3d 1247, 149 n.4 (11th Cir. 2003) (observing that those provisions are "materially identical"), the district court's error in identifying the controlling standard was probably harmless.[7] We do not concern ourselves with the harmlessness question, however, because (as next explained in this decision) the court committed prejudicial error by taking an overly restrictive view of what constitutes the "evidence as a whole" for purposes of either § 2244(b)(2)(B)(ii) or § 2255(h)(1). Thus, in any event, we must remand for a proper § 2255(h)(1) assessment of the Britt claim.

2.

Turning to the district court's prior assessment of the Britt claim, we conclude that, as a result of its flawed interpretation of the "evidence as a whole," the court erred by prohibiting expansion of the record to include evidence received after trial and after the filing of MacDonald's § 2255 motion. Simply put, the "evidence as a whole" is exactly that: all the evi-

---

[7]Furthermore, the district court may have committed harmless error in holding MacDonald to an additional § 2244(b)(2)(B) requirement: that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." § 2244(b)(2)(B)(i). MacDonald was yet obliged to establish that he acted with due diligence, *see* § 2255(f)(4) (imposing a one-year limitations period for a § 2255 motion running from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence"), and the court accepted that he did so, *see* Opinion 28 ("afford[ing] MacDonald the benefit of the assumption that he exercised due diligence in discovering Britt's assertions"); *cf. Wolfe v. Johnson*, 565 F.3d 140, 168 n.42 (4th Cir. 2009) (observing that prisoner apparently exercised diligence in pursuing claim premised on witness recantation, because there was "no indication that [witness] would have been willing to recant his trial testimony any earlier").

dence put before the court at the time of its § 2244(b)(2)(B)(ii) or § 2255(h)(1) evaluation.

a.

Significantly, the § 2244(b)(2)(B)(ii) and § 2255(h)(1) standards — including their "evidence as a whole" provisions — were added to § 2244 and § 2255 with the enactment of AEDPA in 1996. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 105-106, 110 Stat. 1214, 1220-21. Plainly, those standards derived from pre-AEDPA decisions of the Supreme Court regarding the reviewability of abusive and procedurally defaulted federal habeas corpus claims.[8]

For example, in *McCleskey v. Zant*, the Supreme Court recognized that, under the doctrines of abuse of the writ and procedural default, a prisoner seeking to have his abusive or procedurally defaulted claims heard is required to show either "cause and prejudice" or factual innocence implicating a "fundamental miscarriage of justice." *See* 499 U.S. 467, 493-95 (1991). Of particular relevance here, the exception for a fundamental miscarriage of justice requires a showing that "a constitutional violation probably has caused the conviction of one innocent of the crime." *Id.* at 494 (reiterating standard spelled out in *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). In *Sawyer v. Whitley*, the Court refined the fundamental miscarriage of justice exception for situations in which the prisoner asserted innocence of the death penalty, rather than the offense of conviction. *See* 505 U.S. 333, 335-36 (1992). The *Sawyer* Court held that, in those circumstances, "one must show by clear and convincing evidence that, but for a consti-

---

[8]The Supreme Court has explained that abusive claims are those that were "not raised, and thus defaulted, in the first federal habeas proceeding." *McCleskey v. Zant*, 499 U.S. 467, 490 (1991). On the other hand, procedurally defaulted claims are those that were "defaulted in state court." *Id.*

tutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Id.* at 336.

Thereafter, the Supreme Court clarified in *Schlup v. Delo* "that the *Carrier* 'probably resulted' standard rather than the more stringent *Sawyer* standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence [of a crime] to avoid a procedural bar." 513 U.S. 298, 326-27 (1995). Expounding on the *Carrier* "probably resulted" standard, the *Schlup* Court explained that such standard requires the petitioner to "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. With respect to both the *Carrier* and *Sawyer* standards, the Court observed that "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329.

The *Schlup* Court was careful to distinguish the claim of innocence before it — "'a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits'" — from a freestanding actual innocence claim. *See* 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). And, the Court observed that, "[t]o be credible, [a gateway innocence] claim requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Id.* at 324.

Explaining the proper assessment of a gateway innocence claim, the *Schlup* Court recognized that, because "[t]he *Carrier* standard is intended to focus the inquiry on actual innocence, . . . the district court is not bound by the rules of

admissibility that would govern at trial." 513 U.S. at 327. Rather, the Court observed,

> the emphasis on actual innocence allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the *Carrier* standard, . . . [t]he habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.

*Id.* at 327-28 (internal quotation marks omitted).

Following the enactment of AEDPA, the Supreme Court had occasion in *House v. Bell* — because it involved claims asserted in a first § 2254 habeas corpus petition that were procedurally barred under state law — to invoke its decision in *Schlup*. *See* 547 U.S. 518, 539 (2006) (observing that no AEDPA "provision addresses the type of petition at issue here — a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence"). The *House* Court emphasized that, although "a gateway claim requires 'new reliable evidence,'" the district court's assessment "is not limited to such evidence." *Id.* at 537 (quoting *Schlup*, 513 U.S. at 324). Indeed, as the Court recognized,

> *Schlup* makes plain that the habeas court must consider "all the evidence," old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial."

*Id.* at 538 (quoting *Schlup*, 513 U.S. at 327-28); *see also Sharpe v. Bell*, 593 F.3d 372, 377-78 (4th Cir. 2010)

(acknowledging Supreme Court's directive to review "all the evidence" in assessing gateway innocence claim); *Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999) (recognizing that, under *Schlup*, a gateway innocence claim should be evaluated "in light of all available evidence, including that considered unavailable or excluded at trial and any evidence that became available only after trial").

b.

The § 2244(b)(2)(B)(ii) and § 2255(h)(1) standards clearly incorporate features of the standards spelled out in the pre-AEDPA decisions in *Carrier*, *Sawyer*, and *Schlup*. Focusing specifically on the standard applicable here, § 2255(h)(1) — like *Schlup* — obliges the prisoner to proffer some new evidence in support of his habeas corpus claim. *See* § 2255(h)(1) (requiring "newly discovered evidence"); *Schlup*, 513 U.S. at 324 (recognizing that "petitioner [must] support his allegations of constitutional error with new reliable evidence"). Both § 2255(h)(1) and *Schlup* also require the prisoner, in order to pass through the innocence gateway to have his claim heard, to show "that no reasonable factfinder would have found the movant guilty of the offense," § 2255(h)(1), or, in other words, "that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," *Schlup*, 513 U.S. at 327 (expounding on *Carrier* "probably resulted" standard). Moreover, § 2255(h)(1)'s standard of proof is that imposed by *Sawyer*: "clear and convincing evidence." § 2255(h)(1); *Sawyer*, 505 U.S. at 336.

Consequently, we cannot ignore the pre-AEDPA precedent in interpreting what constitutes the "evidence as a whole." Indeed, by its plain language, "the evidence as a whole" means, in the equivalent language of *Schlup*, "all the evidence." *See* 513 U.S. at 328. Thus, a court must make its § 2244(b)(2)(B)(ii) or § 2255(h)(1) determination — unbounded "by the rules of admissibility that would govern at trial" — based on "all the evidence, including that alleged to

have been illegally admitted [and that] tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.* at 327-28. Or, to say it another way, the "court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under [evidentiary rules]." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 328). That is not to say, however, that the petitioner is to be accorded the benefit of every doubt. To the contrary, the court must give "due regard to any unreliability of" the evidence, *Schlup*, 513 U.S. at 328 (internal quotation marks omitted), and "may have to make some credibility assessments," *id.* at 330. "Because a [gateway innocence] claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 538.

### c.

We must reject the district court's conflicting view, also espoused by the government, of what constitutes the "evidence as a whole." In accordance with that view, the court confined its assessment of the Britt claim to the newly discovered evidence of former Deputy U.S. Marshal Jim Britt and the pre-existing record. *See* Opinion 21-22 (deeming "the record as it presently is constituted to be more than adequate to permit a thorough and complete understanding of the material facts"). The court refused to consider evidence obtained following our grant of prefiling authorization for the § 2255 motion containing the Britt claim — specifically, the DNA test results and the affidavit of the elder Helena Stoeckley — in the absence of our further prefiling authorization for that evidence or additional claims premised on it. The court also declined to take into account evidence that had been submitted with MacDonald's prior unsuccessful postconviction motions, including evidence of the blond synthetic hair-like fibers found on a hairbrush in the MacDonald home, apparently on the theory that to consider such evidence would be

to improperly relitigate the earlier claims. And, the court refused to consider evidence obtained since the filing of the prior postconviction motions, including the three affidavits attached to the § 2255 motion describing confessions made by Greg Mitchell, on the grounds that it simply mirrored evidence previously rejected and was, in any event, untimely.

The government endorses the district court's narrow interpretation of the "evidence as a whole" by contending that a broader reading would effectively nullify three AEDPA provisions: the requirement of § 2244(b)(3) for prefiling authorization from a court of appeals for "a second or successive application" brought by a state prisoner under § 2254 or by a federal prisoner under § 2255; the prohibition in § 2244(b)(1) against entertaining any claim presented in a second or successive § 2254 petition "that was presented in a prior application"; and the one-year limitations periods found in § 2244(d) and § 2255(f) for § 2254 and § 2255 applications. The district court and the government, however, misapprehend the operation of AEDPA's statutory scheme.

When we granted prefiling authorization for the § 2255 motion, it contained a single claim: the Britt claim. In accordance with § 2244(b)(3)(C), we determined that the § 2255 motion made "a prima facie showing" that it satisfied the requirements of § 2255(h)(1), i.e., that the Britt claim was based on "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [MacDonald] guilty of the [murders of his wife and daughters]." It was then incumbent on the district court to conduct a more searching assessment of the Britt claim to determine whether it passed muster under § 2255(h)(1). *See Winestock*, 340 F.3d at 205. Additionally, the court had to be concerned with whether the Britt claim complied with § 2255(f)'s one-year limitations period — which runs, in pertinent part, from "the date on which the facts supporting the claim . . . could have been dis-

covered through the exercise of due diligence," § 2255(f)(4)) — a question that the court essentially answered when it accepted that MacDonald had acted with due diligence in discovering the underlying evidence of former Deputy U.S. Marshal Jim Britt. *See supra* note 7. The court might also have been concerned with § 2244(b)(1)'s prohibition against successive claims raised in second or successive applications, except that the Britt claim was never before presented in any of MacDonald's prior postconviction motions.[9]

The district court clearly went too far, however, when (at the government's urging) it applied the constraints of § 2244(b)(3), § 2255(f), and § 2244(b)(1) to substantially limit the evidence it would consider as part of the "evidence as a whole" in conducting its assessment of the Britt claim. In so doing, the court wrongly conflated MacDonald's proffered evidence with his claim for relief. That is, the court viewed the various items of proffered evidence — such as the DNA test results, the affidavit of the elder Helena Stoeckley, the blond synthetic hair-like fibers, and the three affidavits describing confessions made by Greg Mitchell — as being submitted in support of claims separate and distinct from the Britt claim and each other.[10]

The district court instead should have treated the proffered evidence as part of the "evidence as a whole" in evaluating the Britt claim under § 2255(h)(1). That is, the court should

[9]Furthermore, it is an open issue in this Circuit — one we need not resolve today — whether § 2244(b)(1) applies to successive claims presented in second or successive § 2255 applications. *See Winestock*, 340 F.3d at 205 ("Although [§ 2244(b)(1)] is limited by its terms to § 2254 applications, some courts have also applied it to § 2255 applications. We need not decide here whether to follow this approach." (citations omitted)).

[10]Of course, in addition to proffering the DNA test results as part of the "evidence as a whole" relevant to the Britt claim, MacDonald also sought to rely on those test results in support of the freestanding DNA claim, which we address below. *See infra* Part IV.B.

have considered the proffered evidence — with due regard for "the likely credibility" and "the probable reliability" thereof, *see Schlup*, 513 U.S. at 332 — to determine if it, in combination with the newly discovered Britt evidence, would be sufficient to establish that no reasonable juror would have found MacDonald guilty. If so, MacDonald would merely pass the procedural bar to having the Britt claim considered on its merits, and he would yet be obliged to prove the constitutional violation alleged in that claim before obtaining any § 2255 relief thereon.

3.

In light of the district court's overly restrictive view of what constitutes the "evidence as a whole," we conclude that the court erred in its analysis of the Britt claim by excluding and, thus, ignoring relevant evidence — necessitating remand for a fresh analysis of whether the Britt claim satisfies the applicable standard of § 2255(h)(1). Such assessment must include the previously excluded evidence discussed herein, and may also include other evidence not mentioned, if it is part of the "evidence as a whole" properly put before the court. In these circumstances, we need not reach an additional matter encompassed in MacDonald's COA: whether the court erred in assessing the Britt claim by drawing flawed conclusions from the evidence it did consider. We emphasize, however, that today's decision is not intended to signal any belief that the Britt claim passes muster under § 2255(h)(1) or ultimately entitles MacDonald to habeas corpus relief. Indeed, the standards of § 2255(h)(1) and its predecessor, the fundamental miscarriage of justice exception, were designed to ensure that they could be satisfied only in the "rare" and "extraordinary case." *See Schlup*, 513 U.S. at 321. Nonetheless, we recognize that MacDonald is entitled to a procedurally valid assessment of the Britt claim.[11]

---

[11]We also recognize that the district court's further assessment of the Britt claim will be complicated by the fact that — as the government noti-

B.

On the second issue before us under MacDonald's COA —
whether the district court lacked jurisdiction over the free-
standing DNA claim as a result of MacDonald's failure to
obtain additional prefiling authorization — we conclude that
the court erred in deeming itself to be without jurisdiction.
Simply put, because we granted 28 U.S.C. § 2244(b)(3) pre-
filing authorization for the § 2255 motion raising the Britt
claim, the district court possessed jurisdiction over the sepa-
rate DNA claim insofar as MacDonald had timely and appro-
priately sought to add it to the pending § 2255 motion. *See
Winestock*, 340 F.3d at 205 (concluding that, "because the
[prefiling] authorization requirement applies to the entire
application, the jurisdictional effect of § 2244(b)(3) extends to
all claims in the application").

As we recognized in *Winestock*, when deciding whether to
grant prefiling authorization, we inspect "the application" —
that is, the entire § 2255 motion — "to determine whether it
contains any claim that satisfies" the § 2255(h) standard. *See
340 F.3d at 205; *see also In re Williams*, 330 F.3d 277, 281
(4th Cir. 2003) (observing that "we must determine whether
the motion makes 'a prima facie showing' that [the prisoner]
can satisfy the [statutory] requirements" (quoting
§ 2244(b)(3)(C))). If any one claim satisfies such standard, we

---

fied the court on October 28, 2008 (seven days before the issuance of the
November 4, 2008 Opinion) — the key witness in support of that claim,
former Deputy U.S. Marshal Jim Britt, died on October 22, 2008. And,
despite prior notices filed by MacDonald on September 7, 2007, and
November 5, 2007, warning that Britt had been "suffering from serious
heart problems" and was in "fragile health," Britt was never allowed to
testify in an evidentiary hearing. The government now contends that the
Britt claim is moot as a result of Britt's death — a contention that the gov-
ernment failed to raise in the district court despite having the opportunity
to do so. We leave that issue for the district court on remand, as it will be
in a better position to pass upon the government's mootness claim in the
first instance.

"authorize the prisoner to file the entire application in the district court, even if some of the claims in the application do not satisfy the applicable standard[ ]." *Winestock*, 340 F.3d at 205; *see also Williams*, 330 F.3d at 281 (explaining that, "if any claim meets the statutory threshold, we will grant [prefiling authorization] and allow [the prisoner] to file the [proposed motion] in its entirety"). It is then the responsibility of the district court to more closely scrutinize "each claim and dismiss those that are barred under [§ 2255(h)]." *Winestock*, 340 F.3d at 205.

Here, the district court deemed *Winestock* inapposite because MacDonald sought to add the DNA claim to the § 2255 motion only after our prefiling authorization for the motion was granted and it was submitted to the district court. *See* Opinion 19-20. In analogous circumstances, however, another district court within this Circuit relied on *Winestock* in concluding that our permission was not required to add additional claims to a previously authorized successive § 2255 motion. *See Hazel v. United States*, 303 F. Supp. 2d 753, 758-59 (E.D. Va. 2004). There, the prisoner had "sought and received certification from the Fourth Circuit" for a proposed motion raising a single claim and then, after presenting the motion in the district court, asserted two additional claims. *Id.* at 758. The *Hazel* court concluded that, under *Winestock*, the prisoner could raise the additional claims "even though he did not receive express certification from the Fourth Circuit to do so." *Id.* at 758-59. Nonetheless, the court recognized that the question remained whether the proposed amendments to the § 2255 motion were proper. *Id.* at 759. And, in addressing the propriety of the proposed amendments, the court looked to Federal Rule of Civil Procedure 15(a), which spells out the standards for amending pleadings. *Id.* at 763, 765.[12]

---

[12]Rule 15 is applicable to § 2255 motions by way of 28 U.S.C. § 2242, Federal Rule of Civil Procedure 81(a)(4), and Rule 12 of the Rules Governing Section 2255 Proceedings for the United States District Courts. *See Mayle v. Felix*, 545 U.S. 644, 655 (2005) (recognizing that Rule 15 similarly applies in 28 U.S.C. § 2254 habeas corpus proceedings).

We agree with the *Hazel* court's analysis and utilize it herein: Under *Winestock*, the lack of additional prefiling authorization was no obstacle to MacDonald's pursuit of the DNA claim in the district court; rather, the real potential barrier was Rule 15(a). Accordingly, we vacate the district court's denial of the DNA claim and remand for further proceedings. In so doing, we could instruct the district court to conduct a belated Rule 15(a) assessment of MacDonald's request to add the DNA claim to the pending § 2255 motion, presumably to be followed by an evaluation of the DNA claim under the standard of § 2255(h)(1). It is a more efficient use of judicial resources, however, to simply grant MacDonald prefiling authorization for the DNA claim so that the district court may proceed directly to the § 2255(h)(1) evaluation. *See Winestock*, 340 F.3d at 208 (recognizing that, where appropriate, we may construe prisoner's notice of appeal and appellate brief as motion for authorization to file successive § 2255 motion). Thus, we do just that.[13]

Finally, without expressing any view on the proper disposition of the DNA claim, we acknowledge that MacDonald has a daunting burden ahead in seeking to establish that he is eligible for habeas corpus relief solely because of his "actual innocence." The Supreme Court has only "assume[d], for the sake of argument . . . , that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). The Court has yet

---

[13]In these circumstances, we need not reach MacDonald's alternative theories of jurisdiction with respect to the DNA claim: (1) that, by authorizing the DNA testing in 1997, this Court also implicitly authorized a subsequent § 2255 claim based on the test results; and (2) that no prefiling authorization is necessary, because the DNA claim is properly asserted under the Innocence Protection Act of 2004 (the "IPA"), 18 U.S.C. § 3600, rendering it free from the strictures of AEDPA. Nonetheless, on remand, the district court may consider in the first instance whether the IPA — a statute initially mentioned in this appeal by the government and subsequently invoked by MacDonald — is applicable to the DNA claim.

to come across any prisoner who could make the "extraordinarily high" threshold showing for such an assumed right. *Id.*; *see Dist. Attorney's Office v. Osborne*, 129 S. Ct. 2308, 2321 (2009) ("Whether [a federal constitutional right to be released upon proof of 'actual innocence'] exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."). In any event, MacDonald is entitled at least to the prefiling authorization for his DNA claim that we grant herein, as well as the more searching § 2255(h)(1) evaluation of such claim that the district court must conduct on remand.

## V.

Pursuant to the foregoing, we vacate the Opinion and remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*